**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1388**

DAVID WOOD,

                Plaintiff - Appellant,

      v.

MARYLAND DEPARTMENT OF TRANSPORTATION; MOTOR VEHICLE ADMINISTRATION,

                Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge.  (1:16-cv-03727-JFM)

Argued:  January 23, 2018                          Decided:  May 7, 2018

Before GREGORY, Chief Judge, DUNCAN, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion.  Chief Judge Gregory wrote the opinion, in which Judge Duncan and Judge Floyd joined.

**ARGUED:** Jack Lawrence Benoit Gohn, GOHN HANKEY STICHEL & BERLAGE LLP, Baltimore, Maryland, for Appellant.  Leight Douglas Collins, OFFICE OF THE ATTORNEY GENERAL, Glen Burnie, Maryland, for Appellees. **ON BRIEF:** H. Mark Stichel, GOHN HANKEY STICHEL & BERLAGE LLP, Baltimore, Maryland, for Appellant.  Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

The Appellant, David Wood, suffers from a degenerative eye disease that restricts his field of vision. As a result, the Maryland Motor Vehicle Administration (MVA), a unit within the Maryland Department of Transportation (MDOT), denied his application to renew his driver's license. Wood sued, alleging that the State of Maryland's field of vision requirements violate the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The district court dismissed the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). We affirm.

I.

When this case began, David Wood was 75 years old and had been licensed to drive in Maryland. For over thirty years, Wood maintained an impeccable driving record—without any driving infractions or civil liability.

Maryland requires drivers to periodically renew their licenses and in September 2015, Wood began that renewal process. Maryland applicants seeking a driver's license renewal must meet certain field-of-vision requirements. Md. Code Ann., Transp. § 16-115(i)(1). For unrestricted licenses, applicants must have a continuous field of vision of at least 140 degrees. Md. Code Ann., Transp. § 16-110.1(a)(1)(ii). For restricted licenses, applicants must have a continuous field of vision of at least 110 degrees with at least 35 degrees of vision lateral to the midline of each side. Md. Code Ann., Transp. § 16-110.1(c)(1)(ii).

2

Adults typically have a field of vision extending roughly 180–200 degrees horizontally and about 100 degrees vertically. J.A. 27. But Wood suffers from retinitis pigmentosa, a degenerative eye disease that restricts his peripheral vision. As a result of his condition, Wood has a total field of vision of only 60 degrees and does not meet Maryland's field-of-vision requirement for even a restricted license. Accordingly, the MVA denied Wood's application to renew his license.

Shortly after being denied, Wood petitioned the MVA Medical Advisory Board to have his license renewed. The Board consists of physicians with varying specialties who assess the impact of medical conditions on an applicant's ability to safely operate a motor vehicle. As a part of the Board's review, Wood's primary care physician and ophthalmologist completed a medical survey, which confirmed that Wood had a total field of vision of about 60 degrees. After the Board reviewed Wood's completed medical survey, the MVA informed Wood that his license renewal application was again denied. On November 29, 2015, Wood's driver's license expired.[1]

Seemingly out of options with the MVA, Wood next wrote a series of letters to Maryland's Secretary of Transportation and Attorney General, seeking to have his license reinstated. On February 29, 2016, an Assistant Attorney General wrote Wood explaining

---

[1] We know that Wood's impaired field of vision is a relatively recent development. Based on when his license expired, Wood must have demonstrated a field of vision of at least 110 degrees as of November 2009. *See* Md. Code Ann., Transp. §§ 16-115 (a)(1), (h) (2009) (authorizing issuance of licenses for periods of five years or less and requiring applicants to pass a vision test within 12 months of applying for a renewal). This proves that Wood's field of vision decreased by about fifty percent (from 110 degrees to 60 degrees) in less than six years.

3

that the MVA could not issue him a license because he does not meet the field of vision requirements.

On November 16, 2016, Wood filed a two-count complaint against the MDOT and the MVA (collectively, "the State"), seeking to have his license reinstated. Count One asserts a violation of the Rehabilitation Act, 29 U.S.C. § 701; Count Two alleges a violation of the Americans with Disabilities Act, 42 U.S.C. § 12131. In support of both counts, Wood alleges that (1) his retinitis pigmentosa constitutes a disability; (2) despite his disability, he is "otherwise qualified" to receive a driver's license; and (3) the State did not provide an individualized inquiry into his fitness for a driver's license. There does not appear to be any available means of correcting or augmenting Wood's field of vision. Accordingly, Wood does not seek any accommodation from the State.

In lieu of answering the Complaint, the State filed a Motion to Dismiss for failure to state a claim. As an attachment to its Motion to Dismiss, the State included ten pages of testimony from the 1997 Maryland Senate Bill 303 (hereinafter "bill file excerpts"). Bill 303 aimed to "expand[] the criteria under which an individual is granted a drivers' license to include those with more severe vision problems than is currently allowed." J.A. 40. The bill successfully passed through the Maryland Legislature and became the current version of Maryland's vision requirements to operate a vehicle.[2] The bill file excerpts describe a Vision Standards Work Group, composed of vision experts, driving

---

[2] Bill 303 *decreased* the field of vision requirement from 140 degrees for all licenses to 110 degrees with at least 35 degrees lateral to midline in each eye for a restricted license. J.A. 43.

4

specialists and license examiners, which recommended most of Maryland's current visual field standards.

After noting the State's reliance on the bill file excerpts, Wood requested leave to file a surreply to address, *inter alia*, whether the bill file excerpts were appropriate for the district court to consider at the motion-to-dismiss stage. But, the district court issued an opinion granting the State's Motion to Dismiss. In its opinion the district court discusses the Vision Standards Work Group, apparently referencing the bill file materials. Wood timely appealed.

## II.

"We review de novo the district court's grant of a motion to dismiss." *Cruz v. Maypa*, 773 F.3d 138, 143 (4th Cir. 2014).

Both the ADA and the Rehabilitation Act prohibit discrimination based on disability. *See* 42 U.S.C. § 12101 (ADA); 29 U.S.C. § 701 (Rehabilitation Act). Title II of the ADA governs all programs, activities, and services provided by State or local governments. 42 U.S.C. § 12131. Section 504 of the Rehabilitation Act governs programs or activities receiving federal financial assistance. 29 U.S.C. § 794. The scope of liability under the ADA is generally the same as that under the Rehabilitation Act. *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995).

Wood argues that the district court (a) erred in its substantive analysis, (b) imposed an incorrect pleading standard, and (c) disregarded Fourth Circuit precedent. But neither argument has merit.

A.

Wood argues that the district court erred in its direct-threat analysis. But his argument is misplaced.

Title II of the ADA and Section 504 of the Rehabilitation Act allow for certain affirmative defenses. For instance, "[f]ederal regulations excuse States from complying with the ADA with respect to disabled people who pose a 'direct threat' to others[.]" *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015); *see also* 29 U.S.C. § 705(20)(D) (excluding those who "constitute a direct threat to the health or safety of other individuals" from the Rehabilitation Act's definition of "individual with a disability"). "In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an *individualized assessment*, based on reasonable judgment that relies on *current medical knowledge* or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R. § 35.139 (emphasis added).

According to Wood, dismissal of his complaint was improper because, as a disabled applicant, he "must be determined to pose a direct threat on an individualized basis in light of current medical knowledge, unless it can be shown that individualized consideration will inevitably result in the exclusion of all persons with a disability." Opening Br. at 12. But his argument confuses the procedural posture of this case.

Determining that a disabled person poses a direct threat is a *defense* to a discrimination charge and an exception to compliance with the ADA and the Rehabilitation Act. *See Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 640 (4th Cir. 2016) ("[I]t is a defense to claims under the Rehabilitation Act that [a plaintiff] may pose a 'direct threat' to the welfare of others." (quoting *McGeshick v. Principi*, 357 F.3d 1146, 1151 (10th Cir. 2004))); *see also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (characterizing the ADA's direct threat provision as an affirmative defense). Wood's argument is premature because the State has not asserted the direct-threat defense. Indeed, the phrase "direct threat" is absent from the State's entire brief. Because the State has neither asserted the direct-threat defense nor indicated that it seeks to be excused from the requirements of the ADA and Rehabilitation Act, the State's obligation to prove that defense—by conducting an individualized inquiry based on current medical knowledge—is not triggered. In this case, rather than answering Wood's Complaint and asserting an affirmative defense, the State filed a motion to dismiss. Therefore, our attention in this case must focus on the sufficiency of pleading in the Complaint.

B.

Wood argues that the district court applied an incorrect pleading standard. But that argument also fails.

"The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999). To state a cognizable claim under either the

7

ADA or the Rehabilitation Act, a plaintiff must sufficiently allege "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995). The parties do not dispute that Wood's retinitis pigmentosa constitutes a disability within the meaning of the ADA and the Rehabilitation Act or that he was excluded from the benefit of a driver's license due to his disability. Instead, the parties dispute whether Wood sufficiently pled that he is otherwise qualified to receive a driver's license.

Relying on an unpublished, out-of-circuit case, Wood argues that "the burden rests on the state promulgating each blanket driver's license requirement to show that [each] requirement is essential for the safe operation of a motor vehicle." J.A. 61. But our precedent forecloses that interpretation.

"A *plaintiff* asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (emphasis added). Under Title II of the ADA, a disabled person is otherwise qualified if he is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the *essential eligibility requirements* for . . . participation in" that program. 42 U.S.C. § 12131(2) (emphasis added); *see also* 45 C.F.R. § 83.3(l)(4) (stating a nearly identical standard for Rehabilitation Act claims). Essential eligibility requirements of a program are "those requirements that bear more than a marginal relationship to the program at issue[.]"

*Halpern*, 669 F.3d at 462 (internal quotations and alterations omitted). Therefore, contrary to Wood's assertion, the burden rests on *him* to plausibly allege that he meets the essential eligibility requirements to obtain a license.

Under the correct pleading standard, we conclude that Wood has not met his burden. Relying only on his driving record, Wood argues that even with a 60-degree field of vision he is otherwise qualified to obtain a driver's license. But Wood's driving record, without more, does not plausibly establish that he meets the essential eligibility requirements to receive a driver's license.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a *context-specific* task that requires the reviewing court to draw on its judicial experience and *common sense*." *Id.* (emphasis added). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotations, citations and alterations omitted).

According to Wood, his driving record demonstrates that he is "undeniably" qualified to drive. Opening Br. at 4. But, in this context, accepting Wood's argument strains common sense. Wood's disqualifying vision is of recent origin. *See supra* note 1. Therefore, most of his decades-old driving history cannot speak to his qualification to drive with his current 60-degree field of vision. Even if we consider only the most recent

9

years of Wood's driving history, it does not follow that his driving behavior *in the past* establishes his physical qualification *in the future*—particularly given Wood's already-severe visual impairment and the degenerative nature of his eye condition. *See, e.g.*, *Motor Vehicle Admin. v. Mohler*, 318 Md. 219, 227 (Md. 1990) (noting the difference between an "unsafe" driver and an "unfit" driver). Put simply, an incident-free driving history is commendable, but it is no substitute for vision. And, although Wood believes that he "safely compensates for his deficits in peripheral vision," J.A. 8, his conclusory opinion is not a well-pleaded fact that this Court must accept as true. *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions[.]" (internal citations, quotations and alterations omitted)).

The essence of Wood's Complaint is that the State unlawfully discriminated against him by failing to make a sufficiently individualized inquiry in his case. J.A. 11, 14. But the law does not require individualized inquiry in every case. *See Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287 (1987). And, the level of individualized inquiry Wood desires is not required in this context.

"To achieve the goals of the ADA, Congress charged the Department of Justice with developing regulations to implement Title II. The Department of Justice promulgated a Technical Assistance Manual to set out the requirements under the ADA." *Slager v. Duncan*, 162 F.3d 1155 (4th Cir. 1998) (Table decision) (citing 42 U.S.C. § 12134(a)). Though the Technical Assistance Manual is not an exhaustive list of requirements for governments to meet under Title II, it is persuasive guidance on how to

10

interpret the ADA. *Id.* According to the Department of Justice ("DOJ"), "[a] public entity may establish requirements, such as vision requirements, that would exclude some individuals with disabilities, if those requirements are essential for the safe operation of a motor vehicle. . . . A public entity does not have to lower or eliminate licensing standards that are essential to the licensed activity to accommodate an individual with a disability." The Americans with Disabilities Act: Title II Technical Assistance Manual § II-3.7200 (Nov. 1993). And, with respect to the Rehabilitation Act, then-Chief Judge, now Justice Breyer, explicitly acknowledged a public entity's authority to promulgate reasonable vision standards for driver's licenses, without the need to undergo a more individualized inquiry. *See Ward v. Skinner*, 943 F.2d 157, 162 (1st Cir. 1991) (Breyer, C.J.) (reasoning that the Department of Transportation can "adopt reasonable rules concerning the relationship between certain handicaps, say poor vision, and certain activities like driving."); *see also Buck v. U.S. Dep't of Transp.*, 56 F.3d 1406, 1408 (D.C. Cir. 1995) ("Where the [Department of Transportation] has established a certain safety standard, however, and there is no way in which an individual with a certain handicap can meet that standard, the law does not require the pointless exercise of allowing him to try. . . . Once an individual has admitted that he does not meet such a necessary—as opposed to a merely convenient—standard, the Rehabilitation Act does not forbid the application to him of a general rule.").

At bottom, both the DOJ and our sister circuits support the State in this circumstance. Because Wood's Complaint admits that he does not meet Maryland's field of vision requirement, but proffers no plausible argument for why the requirement is

11

unreasonable, the State was not obligated to provide further inquiry into Wood's non-medical driving record.

C.

Lastly, Wood argues that dismissal of his claims was improper because the district court's decision was inconsistent with our decision in *Pandazides v. Va. Bd. Of Educ.*, 946 F.2d 345, 349 (4th Cir. 1991). We disagree.

*Pandazides* involved a claim of handicap discrimination brought under the Rehabilitation Act. 946 F.2d at 346. The plaintiff, a teacher with several learning disabilities, brought suit against the Virginia Board of Education alleging that the Board unlawfully discriminated against her when it decided she was not "otherwise qualified" to be a school teacher. *Id.* at 346–47. Because the teacher did not meet Virginia licensure requirements, the district court granted summary judgment to the Board. *Id.* at 348. This Court reversed and remanded the case after reasoning that "defendants cannot merely mechanically invoke any set of requirements and pronounce the handicapped applicant or prospective employee not otherwise qualified. The district court must look behind the qualifications. To do otherwise reduces the term 'otherwise qualified' and any arbitrary set of requirements to a tautology." *Id.* at 349.

Wood argues that the district court "failed to do precisely what this Court prescribed in *Pandazides* should be done: it refused to 'look behind the qualifications.'" Opening Br. at 16. But this argument is belied by the facts. Despite the limited information before it, the record demonstrates that the district court did look behind Maryland's field of vision qualifications. In its opinion, the district court notes that

12

Maryland established its field of vision requirement in 1971 and that in 1997 Maryland modified the requirement upon the recommendation of the Vision Standards Work Group, which was composed of medical and driving experts. *Id.* The district court then compared Maryland's vision standards to the instructions set forth in the DOJ Technical Assistance Manual. The district court's discussion is brief but demonstrates that the court considered *when* Maryland's vision requirements came into effect, *why* the requirements changed over time and *how* the requirements compared to the DOJ's interpretation of the ADA. Therefore, we find no reversible error.[3]

## III.

Without question, Wood does not and cannot meet Maryland's field of vision requirement for a driver's license. Wood concedes that his field of vision is 60 degrees—roughly half of what Maryland requires for even a restricted license. He fails to allege, nor can he propose, any accommodation that would allow him to meet Maryland's field of vision requirement. J.A. 63.

---

[3] In addition to arguing that the district court failed to look behind Maryland's vision qualifications, Wood suggests that it is inappropriate to consider the bill file materials. We disagree. "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the documents attached or incorporated into the complaint." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (internal citations and quotations omitted). However, in assessing the propriety of a Rule 12(b)(6) ruling, we may also properly take judicial notice of matters of public record. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Though not set forth in the Complaint, the bill file materials are matters of public record, which we may consider.

Faced with the unfortunate fact that he does not meet Maryland's requirements for driver's license, Wood challenges the requirements themselves. But Congress did not preclude States from establishing reasonable vision standards to determine who is qualified for a driver's license. Because Wood's Complaint fails to plausibly demonstrate that he is qualified for a driver's license or that Maryland's field-of-vision requirement is somehow inconsistent with Congress's intent, his claims must be dismissed.

*AFFIRMED*